# IN THE COURT OF APPEALS OF IOWA

No. 15-1496
Filed January 11, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DEBRA M. SERRINE,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Cheryl E. Traum, District Associate Judge.

Debra Serrine appeals her conviction of operating a motor vehicle while intoxicated, arguing the district court erred in denying her motion to suppress the result of the chemical breath test and other evidence because her statutory and constitutional rights were violated. **AFFIRMED.**

Zeke R. McCartney of Reynolds & Kenline, L.L.P., Dubuque, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Debra Serrine appeals her conviction of operating a motor vehicle while intoxicated (OWI), first offense, in violation of Iowa Code section 321J.6 (2013). She asserts the district court erred in denying her motion to suppress the result of her chemical breath test and other evidence because her constitutional and statutory rights were violated. Because Serrine's performance in field sobriety tests does not constitute testimonial evidence, her constitutional privilege against self-incrimination was not implicated. Serrine's section 804.20 rights to communicate with an attorney or family member were not violated. We affirm.

## I. Background Facts and Proceedings.

In the early morning hours of May 10, 2014, Davenport Officer Ryan Bowers was on patrol in his squad car, parked in a parking lot between Oneida Avenue and Bridge Avenue, facing east. Both avenues are one-way streets, with traffic driving south on Oneida Avenue and north on Bridge Avenue. Around 3:00 a.m., Officer Bowers observed a car turn north on Bridge Avenue, then west towards him through the parking lot, and then go north—the wrong way—on Oneida Avenue. He decided to follow the car, and, from that point in time, the encounter was recorded by the squad car's cameras and the officer's microphone. The video recordings show the following occurred.[1]

Officer Bowers pursued the car on Oneida Avenue as it traveled a short distance before turning right into an apartment building parking lot. He activated

---

[1] The video recordings were admitted into evidence but were not transcribed. We attempted to quote the statements that appear in this opinion as accurately as possible after reviewing the DVD's. Portions of the statements have been abridged or omitted in the interests of economy.

his squad car's top lights just before turning into the parking lot behind the car. The car pulled into a parking spot, and the officer pulled in behind, blocking the car from leaving. The car had a dealer's plate and a temporary registration tag in the rear window.

Officer Bowers got out of his squad car and went to the car's driver-side window. In the driver's seat was defendant Debra Serrine, and in the passenger seat was her friend—and licensed Iowa attorney—Kurt Spurgeon. The officer asked Serrine for her driver's license, which she provided. He asked Serrine if the car had just been purchased, and she explained her father had just bought it. He asked whether she had insurance—she stated she did—and he asked to see the information. When she could not locate it, he asked for the purchase agreement. While Serrine was gathering the information, the officer asked where they were coming from, but neither occupant answered.[2] He asked who lived there, and both occupants answered that Spurgeon lived there. He again asked where they were coming from, and Spurgeon answered, "Downtown." The officer told them it was the second time that night that he saw the car "pull in there" the wrong way. The officer then asked, "You been drinking tonight?" Spurgeon answered, "I have been." The officer told Spurgeon he was not interested in his answer since he was not driving. Serrine did not volunteer an answer.

Officer Bowers asked Serrine if she found "the rest of the paperwork," and Serrine apologized, stating she knew who the insurance agent was. The officer responded she needed to show proof. Serrine continued looking through

---

[2] If either of the occupants answered, it was inaudible on the video.

documents in the car. The officer obtained some information from the temporary registration tag in the window, and after a conversation with Spurgeon and Serrine, he asked Serrine to sit in the back of his squad car. After placing Serrine in the squad car, the officer went back to her car and spoke to Spurgeon. After the officer returned Spurgeon's identification he told Spurgeon he was "welcome to go inside." Spurgeon got out of the car but stayed near it.

Officer Bowers had Serrine exit the car and told her, "We're gonna do a quick test, and how you do on that will determine whether we go any further." He then conducted the horizontal gaze nystagmus test, off camera. He told Serrine, "Your eyes are all over the place," "Your eyes are just jumping from one side to the other." When he says, "I know you've been drinking," Serrine responds, "Yes." Among other things, Serrine and the officer then discussed a mutual acquaintance. Finally, the officer told Serrine, "Here's the deal. We can go down here to the parking lot to finish the test, where the ground's flat and the pavement's smooth, or we can go to the county." Serrine agreed to go to the parking lot conditionally, stating, "so long as [Spurgeon] comes with us. Cause he's the lawyer. So I kinda need that." The officer refused, stating Spurgeon had "nothing to do with this" and Serrine was "not under arrest."

Officer Bowers walked to Serrine's car to get her jacket, and on the way he talked to Spurgeon. He told Spurgeon he wanted to take Serrine down to the parking lot to finish the test, stating Serrine "was showing signs." Spurgeon asked how Serrine was doing and if she was okay, and the officer told him, "She seems fine." Spurgeon and the officer then discussed the field sobriety test.

While in the squad car, Serrine banged on the window to get Spurgeon's attention. The rear-facing interior camera video shows Serrine making the "call me" gesture. The squad-car door was opened and Serrine then talked to Spurgeon. Serrine told Spurgeon they would be in the parking lot, and she asked him to come with her. He told her yes, and Officer Bowers responded, "I told her no." Spurgeon answered, "Oh, okay." After some conversation, unintelligible from the recording, the officer gave Serrine her coat. While putting it on, she asked, "Will you call him? Please?" She then said, "Kurt!" She told him to "call him and then come down there." The following exchange occurred:

> Officer: Okay, I'm not sure if you're not understanding what I'm saying. He is not allowed down there.
> Serrine: Why?
> Officer: Because he'll be interfering with my job. I'll have to watch him and you at the same time, and I'm not gonna have that. Okay? You don't need him there. I don't care if he's a lawyer. He's not allowed down there. Okay?
> Serrine: Okay.
> Officer: Okay? He understands that.
> Serrine: [sounds like] I don't really understand that.
> Officer: I don't know why, maybe it's because you're intoxicated.
> Serrine: No. That's not what—
> Officer: Okay
> Serrine: No, No. That's not—like, that's not why at all [unintelligible].
> Officer: You-you want him down there because he's a lawyer?
> Serrine: No. I want him down there because I don't know you.
> Officer: Officer Bowers. I am with Davenport Police—
> Serrine:—and—and I get that—
> Officer: OK.
> Serrine:—and I completely appreciate that.
> Officer: So you don't trust me?
> Serrine: No I don't. [Unintelligible] 'cause I don't know you.
> Officer: That's sad. That's very sad. So I want—
> Serrine: And—
> Officer:—we're gonna continue this—

Serrine:—But at the same time, I don't understand why he can't be there.

Officer: I just explained that to you.

Serrine: But why can't he be there? 'Cause you don't want him to be there.

Officer: I don't want him to be there 'cause I don't wanna have to worry about him—

Serrine: Okay, but legally—

Officer: I don't know him, and I don't know you—

Serrine: I know exactly—

Officer: [Unintelligible] pay attention to what you're doing.

Serrine: Exactly! But legally, why can't he be there?

Officer: Because it'll be interference with official acts.

Serrine: So, legally—

Officer:—legally, I have the right to refuse—

Serrine:—him being there.

Officer: Yes, absolutely.

Serrine: Okay. [Serrine leaned towards the other window, presumably towards Spurgeon]. And that's right?

Spurgeon: [Unintelligible.]

Serrine: What?

Spurgeon: I'm not a criminal attorney, [Unintelligible].

Unknown: [Unintelligible.]

Serrine: All right. So, well, just call him, and we'll see what happens.

Unknown: [Unintelligible.]

Serrine: Okay.

Unknown: [Unintelligible.]

Serrine: Kurt, call him.

[Unintelligible, talking over one another.]

Serrine:—Kurt. Call him. And—

Unknown: [Unintelligible.]

Serrine:—I want to know why you can't be there.

Unknown: [Unintelligible.]

Serrine:—It's literally half a block down the street [unintelligible]—

Unknown: [Unintelligible.]

Serrine:—And, it's obviously going to be, like, videotaped anyways—

Unknown: [Unintelligible.]

Serrine:—I know! It makes no sense to me.

Unknown: [Unintelligible.]

Serrine:—So yeah. So it's going to be videotaped. Call him, and wake him up. And—

Spurgeon: I just did. He didn't answer.

Serrine: Well, call [another person] then! Call them, because I want some sort of legal [unintelligible] of things—

Unknown: [Unintelligible.]
Serrine:—Kurt, no.  This does not seem legitimate.

Officer Bowers and Spurgeon conversed away from the car and the microphone picked up only bits and pieces.  The officer explained he could not conduct the field sobriety tests right there because the ground was not flat, Serrine was in heels, and the terrain was a little rough.  He wanted to conduct the field sobriety tests in a nearby parking lot that was flat.  He explained the other options were either the Sally Port or the jail.  The officer went back to Serrine, telling her that if she did not "feel comfortable doing this in the parking lot down there with [him], then [they]'ll go to the county jail."  Serrine again asked why Spurgeon could not come with them:

Officer: Why do you want him there?
Serrine: Honestly?
Officer: Yeah
Serrine: Because [unintelligible].
Officer: Cause what?
Serrine: I've heard too many, like, other stories.

Serrine finally consented to going to the nearby parking lot to perform the tests.  Officer Bowers drove Serrine to the lot, and another officer, Officer King, assisted.  Officer Bowers had Serrine perform field sobriety tests.  Officer Bowers then had Serrine take a preliminary breath test.  She tried but unsuccessfully blew three times.  The fourth time apparently registered a reading, and Officer Bowers told her he decided they "were going to go down to county."  Serrine asked what the result was, and he answered, "High."  She asked to see, and Officer Bowers refused.  She asked several more times.  The following exchange occurred.

Serrine: So, what you're saying is you won't show me what I blew.

Officer: Correct. That is exactly what I'm saying.

Serrine: And you won't say what I blew.

Officer: That is correct as well.

Serrine: Okay. And you won't—and you refuse to bring my lawyer with us down to this [unintelligible].

Officer: You didn't introduce him as—

Serrine:—Correct—

Officer:—as your lawyer.

Serrine: Oh no, I—You completely were like, oh, you want–you don't want me to bring my lawyer. You—

Officer: No.

Serrine: You specifically—I'm pretty sure that like that—

Officer King [off camera]: Your lawyer has no right to be here for [unintelligible]—

Serrine:—oh, I get that—

Officer King: [Unintelligible]—

Serrine:—but he just said that I had no right to have my lawyer here.

Officer King: Correct. That is correct.

Serrine: Yeah. That's great! [Unintelligible.] I'm just trying to get the wording correct.

Officer: Here's [unintelligible]—

Officer King: [Unintelligible] you're stalling for time—

Officer: —Let's go—

Serrine:—No, I'm not—

Officer King: —interference [unintelligible].

Officer: —Let's go—

Serrine: So, you're saying I'm under arrest.

Officer: I'm saying you're going—

Serrine:—No, you're saying I'm under arrest.

Officer King: You can put her under arrest—

Officer: You're under arrest.

Serrine: All right.

Officer Bowers transported Serrine to the county jail. While in the Sally Port, Serrine asked to call her lawyer. She was advised she could do so after being searched. She again asked to call her lawyer while in the Datamaster room. Initially, the officer told Serrine she could call her lawyer after he read her the implied consent, but he then permitted her to make several calls before reading the implied consent advisory. No one answered her calls initially. While

she continued making calls, she again asked the officer what she blew. Officer Bowers told her it was over .08. Serrine eventually reached Spurgeon and asked him to contact other attorney friends, and she asked Spurgeon to come get her. She did not ask him for legal advice, but she asked him to do whatever he had to do to get her out and to come down there immediately.

Shortly thereafter Officer Bowers read Serrine the implied consent advisory. He asked if she understood it, and she replied, "No." He asked her what she did not understand, and she answered, "Not much." Officer Bowers then went back over the advisory with her, and he asked her if she would consent to provide a breath sample for chemical testing. She consented.

Officer Bowers administered the Datamaster test. The result showed a blood-alcohol content of .163. The officer read to Serrine the standard *Miranda* warning and waiver of rights. Serrine declined to speak to Officer Bowers any further.

On June 6, 2014, the State filed its trial information charging Serrine with OWI. Serrine subsequently filed a motion to suppress, arguing she had made several requests to speak with an attorney but her requests were ignored. Serrine asserted her statements to the officer, after invoking the right to counsel, were made involuntarily and in violation of the Iowa and United States Constitutions.

Following a hearing on the motion, the district court entered its ruling denying-in-part and granting-in-part Serrine's motion. The court found no violation of section 804.20 because Serrine was freely allowed to speak with Spurgeon at the scene, and neither Serrine nor Spurgeon requested additional

time or privacy. Additionally, it noted section 804.20 only required that, after arriving at the place of detention, she be given the opportunity to call and speak to an attorney, which was what happened. However, the court found that while the stop was supported by probable cause, Serrine was in custody once Officer Bowers ordered her to exit her car. Because she was not advised of her *Miranda* rights until she was at the jail, the court found her responses to answers asked by the officer between those times inadmissible. The court noted that her unsolicited comments and statements were admissible.

A trial to the bench was held in May 2015. After considering all of the testimony, the exhibits, and assessing the "credibility to the State's witnesses," the court found the State proved beyond a reasonable doubt that Serrine was impaired when she was driving the car and found her guilty of OWI, first offense. The court explained Serrine "was observed driving a vehicle on the night in question. The court observed and could hear [Serrine] on the video. [Serrine] scored .163 on the Datamaster test[,] which is above .08."

Serrine now appeals.

## II. Discussion.

Serrine argues the district court erred in not suppressing her chemical-test results and other evidence because the State violated Iowa Code section 804.20.[3] Additionally, she asserts Officer Bower's "actions constituted a violation of [her] constitutional rights" requiring all evidence from the investigation be

---

[3] The State notes in its brief that a violation of section 804.20 was not expressly raised in Serrine's motion to suppress, but it concedes the issue was raised at the hearing and addressed by the district court in its ruling. Accordingly, we find the claim preserved for our review.

suppressed, including the video and results of her field sobriety test, which she argues was testimonial evidence. Without that evidence, Serrine contends the officer had no ground to invoke implied consent under section 321J.6.

The district court's interpretation of Iowa Code section 804.20 is reviewed for errors at law, and we must affirm the court's motion-to-suppress ruling if "the court correctly applied the law and substantial evidence supports the court's fact-finding." *State v. Lamoreux*, 875 N.W.2d 172, 176 (Iowa 2016). However, constitutional challenges, including those challenging a statute or claiming evidence should have been suppressed because it was obtained in violation of the federal and state constitutions, are reviewed de novo. *See State v. Baldon*, 829 N.W.2d 785, 789 (Iowa 2013), *see also State v. Senn*, 882 N.W.2d 1, 6 (Iowa 2016) (plurality opinion).

### A. *Testimonial Evidence.*

We begin with Serrine's constitutional testimonial-evidence claim. She argues her performance in the field sobriety tests should have been suppressed for the same reasons the district court suppressed her responses to questions asked by Officer Bowers up until the point she was given her *Miranda* warning at the jail. She urges us to rule that field sobriety tests constitute testimonial evidence, although she recognizes that the Iowa Supreme Court has "implicitly, if not explicitly, ruled that a person's performance in field sobriety tests constitutes non-testimonial evidence." *See, e.g.*, *State v. Mannion*, 414 N.W.2d 119, 121 (Iowa 1987) (discussing holding in *State v. Heisdorffer*, 164 N.W.2d 173, 176 (Iowa 1969), "that a policeman's observations of a suspect's performance of sobriety tests at the police station after arrest constituted real rather than

communicative evidence and did not violate the suspect's privilege against self-incrimination" and analogizing that "[b]ecause an officer may testify of his observations of a suspect's movements, we think a videotape of those movements is also admissible"); *State v. Rauhauser*, 272 N.W.2d 432, 436-37 (Iowa 1978) (finding arresting officers' testimony "describing [Rauhauser's] manner of speech was not rendered inadmissible by the failure of the arresting officers to give *Miranda* warnings" because "the testimony was restricted to the physical characteristics of [Rauhauser's] speech" and not its content); *see also State v. Garrity*, 765 N.W.2d 592, 597 (Iowa 2009) ("The closer question is whether to exclude the DVD recording of Garrity taken at the police station. From the district court's opinion, it is evident that the court did not use statements from the DVD as the basis for its decision. Rather, the DVD was used to demonstrate Garrity's body motions, judgment, slurred speech and inability to communicate. Under this record, the exclusionary rule does not extend to the use of the recording for this purpose."). Even if we were inclined to rule as Serrine requests, as an intermediate appellate court, we have no such power. *See State v. Miller*, 841 N.W.2d 583, 584 n.1 (Iowa 2014) ("Generally, it is the role of the supreme court to decide if case precedent should no longer be followed."); *State v. Eichler*, 83 N.W.2d 576, 578 (Iowa 1957) ("If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves."); *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent."). Consequently, we must deny Serrine's requested relief on this issue.

**B.  Section 804.20.**

Serrine also argues her statutory rights under Iowa Code section 804.20 were violated when she requested to speak with Spurgeon multiple times and her requests were denied.  Iowa Code section 804.20 provides:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay *after arrival at the place of detention*, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both.  Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney.  If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained.  If such person is intoxicated . . . , the call may be made by the person having custody.  *An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay.*

(Emphasis added.)  This section affords "a limited statutory right to counsel before making the important decision to take or refuse the chemical test under implied consent procedures."  *Senn*, 882 N.W.2d at 7 (citations omitted).  The State conversely argues section 804.20 was inapplicable.  Alternatively, it asserts Serrine did not properly invoke her section 804.20 rights if they were applicable, and in any event, the purpose of the statute was satisfied when she was allowed to contact Spurgeon and others before she consented to submit to chemical testing.

**1. Were Serrine's section 804.20 rights implicated prior to her formal arrest?**

The State first argues section 804.20 was not implicated prior to Serrine's formal arrest, citing *State v. Krebs*, 562 N.W.2d 423, 426 (Iowa 1997).  In *Krebs*, the "court determined that a request for counsel made during field sobriety tests

was premature under section 804.20 because at that point [Krebs] was not under arrest or 'restrained of his liberty for any reason whatever.'" *State v. Dennison*, 571 N.W.2d 492, 495 (Iowa 1997) (summarizing *Krebs*, 562 N.W.2d at 426). The *Krebs* court explained:

> Field sobriety tests are used by peace officers to determine whether there are reasonable grounds to believe a person is intoxicated. These tests are part of an officer's investigation to determine if a criminal offense has occurred. At this point in the investigation, the defendant is merely being detained by the officer, not restrained of his liberty. *See Berkemer v. McCarty*, 468 U.S. 420, [441-42 (1984)] (requesting motorist to perform field sobriety tests was not the functional equivalent of formal arrest requiring *Miranda*); *In re S.C.S.*, 454 N.W.2d 810, 813-14 (Iowa 1990) (holding juvenile was not "in custody" for purposes of *Miranda* or the juvenile code during field sobriety testing). Although section 804.20 may be implicated in a situation short of a formal arrest, we do not believe the language "restrained of the person's liberty for any reason whatever" extends to the investigatory portion of a traffic stop. To interpret the statute otherwise would thwart all investigations upon a person's request to contact a family member or an attorney. We do not believe the legislature intended such an impediment in enacting the protections of the statute. Our prior cases have explained the purpose of section 804.20 is "to give a person held in custody the right to consult with or have the advice and aid of members of his family in regard to his own troubles." *State v. Tornquist*, [120 N.W.2d 483, 493 (Iowa 1963)]; *see also State v. Craney*, 347 N.W.2d 668, 679 (Iowa 1984) (purpose of section 804.20 is to enable the person to arrange for legal consultation and assistance).
> . . . Because Krebs did not make any requests to call his wife *after* his arrest, he cannot rely on section 804.20 for reversal.

562 N.W.2d at 426.

Like in *Krebs*, Serrine asked to talk to Spurgeon during the field sobriety tests. But, unlike *Krebs*, that was not the only time she asked to talk to him. Like in *Krebs*, Serrine was not formally arrested. But, unlike *Krebs*, the district court here found Serrine was in custody after she was ordered to get out of her vehicle and then ordered to sit in the squad car. The State seeks to distinguish custody

and arrest in the context of section 804.20, pointing out that in *Robinson* the court specifically stated section 804.20 applied "to the period after *arrest*." *See Robinson*, 859 N.W.2d 464, 486 (Iowa 2015) (emphasis added). However, the *Robinson* court made the comment in the factual context of that case, where there was no question that Robinson had been arrested and restrained. *See id*. As the court noted in *State v. Moorehead*, the statute's language applies to those "arrested *or restrained* of the person's liberty for any reason whatever," and the *Moorehead* court had no problem finding section 804.20 applicable under the facts of that case, even though the request was made at the scene and the accused had not been formally arrested. *See* 699 N.W.2d 667, 672 (Iowa 2005) (emphasis added). This makes sense, given that formal words announcing an arrest are not required for a suspect to be arrested. *See State v. Wing*, 791 N.W.2d 243, 248 (Iowa 2010). Rather, under the statutory definition of "arrest," an arrest occurs when a person is taken into custody "in the manner authorized by law, including restraint of the person or the person's submission to custody." Iowa Code § 804.5. A suspect is in custody when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009) (citations omitted). We agree with the district court's conclusion that Serrine was in custody when she was ordered out of her car and into the squad car, thus restraining her liberty. Serrine's section 804.20 rights were implicated at that time.

### 2. Were Serrine's Section 804.20 Rights Violated?

Assuming, without deciding, that Serrine invoked her section 804.20 rights prior to her formal arrest, we next turn to whether those rights were violated. She

argues her section 804.20 rights were violated because the officer did not allow Spurgeon to accompany Serrine during the field sobriety tests and never allowed Serrine to consult Spurgeon in private at the scene. The State argues Serrine's brief conversation with Spurgeon at the scene afforded her a reasonable opportunity to speak with him, and if Spurgeon wanted more than that, he should have asked; in any event, Serrine was allowed to call Spurgeon at the jail prior to consenting to chemical testing. Serrine argues this was not enough. We disagree. Although one may invoke section 804.20 rights before arriving at the ultimate place of detention,[4] a call or consult need not take place until after arrival at the ultimate place of detention. Serrine was not entitled to a call or consult at roadside, in the parking lot, or in the squad car, i.e., during the investigatory pre-arrest period of time. She was entitled to a call or consult only at her final place of detention—the jail.

The first sentence of section 804.20 states:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay *after arrival at the place of detention*, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both.

(Emphasis added.)

"Place of detention" is not defined in the statute. The section 804.20 right to call or consult arises *after arrival* at the place of detention. To "arrive" at a place, one must come from somewhere else. In the present context, that somewhere else was the place where Serrine's liberty was first restrained—the

---

[4] Nothing in the plain language of section 804.20 requires that a person wait to make a request for counsel or a family member at the *ultimate* place of detention. *Moorehead*, 699 N.W.2d at 672.

scene where she was stopped. She arrived at the jail. It necessarily and logically follows that her right to make a call or have a consultation did not arise until after she arrived at the jail. She had no statutory right to have Spurgeon accompany her during the field sobriety tests or to consult with him at the scene.

Serrine further complains she was not allowed to consult in private with Spurgeon at the scene. Section 804.20 provides, "An attorney shall be permitted to see and consult confidentially with such person alone and in private *at the jail or other place of custody* . . . ." (Emphasis added). Serrine's statutory right to make a call or have a consultation did not arise until she arrived at the jail. Her right to a *private* consultation arose no sooner than her right to make a call, consult with, or see a family member or attorney. Serrine had no statutory right to a private consultation with Spurgeon at the scene.

Serrine further complains her section 804.20 rights were violated when Officer Bowers did not inform her at the jail of her right to a private consultation with a lawyer. The record does not disclose that Serrine ever made a request to talk to a lawyer in private—at the scene or at the jail. A request for privacy is necessary in order to trigger an officer's duty to inform the person that the attorney must come to the jail for a confidential conference. *See State v. Hellstern*, 856 N.W.2d 355, 364-65 (Iowa 2014). With no request for privacy, the officer's duty to inform was not triggered. *Id.*

Serrine was allowed to make her calls, including one to Spurgeon, at the jail prior to consenting to chemical testing. We find no violation of her section 804.20 rights.

### *III. Conclusion.*

We conclude: (1) because Serrine's performance in field sobriety tests does not constitute testimonial evidence, her constitutional privilege against self-incrimination was not implicated; (2) section 804.20 was implicated when Serrine was restrained of her liberty at the scene; and (3) her section 804.20 rights were not violated. The district court did not err when it denied Serrine's motion to suppress. Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**