In the Interest of S.C.S., A Child, Appellant.

No. 89–295.

Supreme Court of Iowa.

April 18, 1990.

Daniel H. Swift of Swift & Swift, Manchester, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Kathrine S. Miller–Todd, Asst. Atty. Gen., for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and NEUMAN, JJ.

LAVORATO, Justice.

On further review of a court of appeals decision, we are faced with two issues. First, should the juvenile court have suppressed the results of certain field sobriety tests obtained allegedly in violation of a juvenile's statutory right to counsel? Second, was there sufficient evidence to sustain a finding that the juvenile was operating a motor vehicle while intoxicated? We do not consider several other issues the juvenile raises because they are either moot or were not properly preserved for appeal.

The court of appeals held that the results of the field sobriety tests should have been suppressed and reversed on that basis alone. We disagree and vacate the decision of the court of appeals and affirm the judgment of the district court.

I. *Background Facts and Proceedings.*

In the early morning hours of June 11, 1988, fifteen-year-old S.C.S. and a friend, C.D., left a dance in S.C.S.'s pickup. S.C.S. had consumed six 8–ounce glasses of beer at the dance.

S.C.S. was driving the pickup and C.D. was sitting in the passenger's seat. The pair were heading west on Highway 939 near Winthrop. They stopped at a friend's house that was near the highway. As they left the house, they pulled out in front of a marked patrol car operated by Jerry Dean Furness, a Buchanan County deputy sheriff. The deputy had to brake hard to avoid a collision with the pickup.

Furness followed the pickup for about a quarter of a mile. While following the pickup, Furness noticed that it crossed the center line four or five times and then it pulled into another farm drive just off the highway.

Furness pulled in behind the pickup. At this point he turned on his red lights. As Furness got out of his vehicle, he could see S.C.S. and C.D. switching positions.

Furness asked S.C.S. to get out of the pickup. When he did so, S.C.S. swayed side to side and had to lean up against the pickup. Furness smelled alcohol on S.C.S.'s breath and noticed that the youngster's eyes were red and watery.

Furness asked S.C.S. for his driver's license. S.C.S. said he forgot his license at home. S.C.S. then identified himself as someone else.

Furness asked S.C.S. to take some field sobriety tests, and S.C.S. agreed. Furness administered five such tests. S.C.S. failed three out of the five tests and did poorly on the other two. At this point Furness placed S.C.S. under arrest for operating while intoxicated. S.C.S. then handed Furness his billfold and correctly identified himself.

After S.C.S. was placed under arrest, he was given a blood test to which he consented. The test was in excess of the legal limit for intoxication.

The State filed a delinquency petition against S.C.S. The State alleged a violation of Iowa Code section 321J.2 (1987), operating while intoxicated.

S.C.S. moved to suppress the results of the field sobriety tests, the blood test result, and certain statements attributed to S.C.S. and allegedly made after the formal arrest. The State did not resist the motion as to the blood test result and the statements.

The juvenile court referee found that the results of the field sobriety tests were admissible and overruled the motion. Later the referee in the adjudication stage found that S.C.S. had operated a motor vehicle while intoxicated. At the disposition hearing, the referee allowed S.C.S. to remain with his parents under the supervision of the Department of Juvenile Court Services provided he abide by various terms and conditions.

On review, the district court affirmed the referee's decision as to the motion to sup-

press, the adjudication, and the disposition. This appeal followed.

We transferred the case to the court of appeals, which reversed. The case is now before us on an application for further review by the State.

## II. *Suppression of Results of the Field Sobriety Tests.*

S.C.S. contends here as he did in juvenile court that the results of the field sobriety tests should have been suppressed. In support of this contention he relies on Iowa Code section 232.11(1)(a) and (2) (1987).

■ Section 232.11(1)(a) provides that a child shall have the right to be represented by counsel

[f]rom the time the child is taken into custody for any alleged delinquent act that constitutes a serious or aggravated misdemeanor or felony under the Iowa criminal code, and during any questioning thereafter by a peace officer or probation officer.

Section 232.11(2) pertinently provides that a child's right to be represented by counsel under section 232.11(1)(a) cannot be waived by a child less than sixteen years of age without the written consent of the child's parent, guardian, or custodian.

The alleged delinquent act here—operating while intoxicated—would constitute a serious misdemeanor under the criminal code. Iowa Code § 321J.2(2)(a). At the time of the stop, S.C.S. was less than sixteen years of age. In addition, it is undisputed that the field sobriety tests were performed in the absence of counsel and without the consent of S.C.S.'s parents. So the narrow question we must answer is whether S.C.S. was in custody at the time the field sobriety tests were performed. For reasons that follow, we think S.C.S. was not in custody.

■ The term "taking into custody" in section 232.11(1)(a) is defined in section 232.2(50) as follows:

"Taking into custody" means an act which would be governed by the laws of arrest under the criminal code if the subject of the act were an adult. The taking into custody of a child is subject to all constitutional and statutory protections which are afforded an adult upon arrest.

Simply put, our juvenile code makes no distinction between an adult and a child on the issue of whether a person is in custody.

Once the police take a suspect into custody, they must give the suspect the so-called *Miranda* warnings before initiating any interrogation. If the police fail to give such warnings, the suspect's responses cannot be introduced into evidence to establish the suspect's guilt. The suspect in these circumstances is protected by the privilege against self-incrimination under the fifth amendment to the United States Constitution. *See Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 719 (1966); *accord Berkemer v. McCarty*, 468 U.S. 420, 428–29, 104 S.Ct. 3138, 3144, 82 L.Ed.2d 317, 327 (1984).

Under *Miranda* in-custody interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. This definition of in-custody interrogation applies to Iowa Code chapter 232, and more particularly sections 232.2(50) and 232.11(1)(a). *In re J.A.N.*, 346 N.W.2d 495, 499 (Iowa 1984).

The exclusionary rule in *Miranda* applies regardless of the nature or severity of the offense of which a person is suspect or for which a person is arrested. *Berkemer*, 468 U.S. at 434, 104 S.Ct. at 3147, 82 L.Ed.2d at 331. But roadside questioning of a motorist detained due to a routine traffic stop does not constitute custodial interrogation for purposes of the *Miranda* exclusionary rule. *Id.* at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 334–35 (statements and results of field sobriety test were admissible).

In *Berkemer*, the Supreme Court acknowledged that a traffic stop is a seizure within the meaning of the fourth amendment. *Id.* at 436–37, 104 S.Ct. at 3148, 82 L.Ed.2d at 332–33. But the Court refused to say that a routine traffic stop:

exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.

*Id.*

The Court described two features of a routine traffic stop which "mitigate the danger that a person will be induced to speak where he would not otherwise do so freely." *Id.* at 437, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. First, the detention is ordinarily temporary and brief. A motorist expects to spend a few minutes answering questions and waiting while the officer checks the motorist's license and registration. If the officer does issue a citation, the motorist usually expects to continue on without any further detention. In contrast, station house interrogation is frequently prolonged. The detainee often knows that the questioning will continue until the detainee gives the answers the police seek. *Id.*

Second, in a typical traffic stop a motorist does not feel completely at the mercy of the police. Admittedly, some pressure is exerted in the form of a uniformed and armed officer who has the discretion to issue a citation. On the other hand, the interaction between the motorist and the officer is usually seen by pedestrians or other motorists. This public exposure reduces the ability of an unscrupulous officer to use illegitimate means to elicit self-incriminating statements. *Id.* at 438–39, 104 S.Ct. at 3149, 82 L.Ed.2d at 333–34.

Such exposure also reduces the motorist's fear that failure to cooperate will subject the motorist to abuse. Typically one, rather than several, officers confront the motorist. In short, the circumstances of such a stop are "substantially less police-dominated than that surrounding the kinds of interrogation at issue in *Miranda* itself" and in subsequent cases in which the Court has applied *Miranda*. *Id.* at 439, 104 S.Ct. at 3149–50, 82 L.Ed.2d at 334.

The noncoercive aspect of a routine traffic stop prompted the Court to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*. *See id.* at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 335. However, the Court stopped short of establishing a bright line test. It refused to say that motorists need not be advised of their *Miranda* rights until they are formally placed under arrest. The Court recognized that there may be situations when *Miranda* would apply even though there has been no formal arrest. Supposedly these situations would arise when a motorist is subjected to restraints comparable to those associated with a formal arrest. *Id.*

Several facts led the Court to conclude that the traffic stop it was considering was nothing more than routine. First, there was nothing to suggest that at any time between the stop and the formal arrest, the defendant was subjected to restraints comparable to those associated with a formal arrest. *Id.* at 441, 104 S.Ct. at 3151, 82 L.Ed.2d at 336.

Second, the time between the stop and formal arrest was short. *Id.* Third, although the officer decided to take the defendant into custody as soon as the defendant got out of the car, he never communicated that decision to the defendant during the interval between the stop and the arrest. In the Court's view, such an unarticulated decision has no bearing on the question whether a suspect is in custody at a particular time. The test is how a reasonable person in the suspect's position would have understood the situation. *Id.* at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336.

Last, there was nothing in the interaction between the defendant and the officer to suggest that the defendant was exposed to custodial interrogation at the scene. The most the facts suggest is that "a single officer asked" the defendant "a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists." *Id.* The Court failed to see how this form of treatment could be fairly characterized as "the functional equivalent of formal arrest." *Id.*

In our view, the facts here—like those in *Berkemer*—amount to nothing more than a

routine traffic stop. Like the officer in *Berkemer*, Furness—who was alone—simply had S.C.S. get out of the pickup and perform the field sobriety tests. As in *Berkemer*, this was done before Furness ever advised S.C.S. that he was under arrest. The time interval between the stop and the formal arrest was short. During this short interval Furness never informed S.C.S. that his detention would be anything but temporary. In short, there was simply nothing in the record to suggest that S.C.S. was in custody during this interval. The juvenile court referee and the district court were correct in so finding. So we conclude there was no error in allowing the results of the field sobriety tests into evidence.

### III. *Sufficiency of the Evidence.*

■ S.C.S. also contends that there was insufficient evidence to establish beyond a reasonable doubt that he was operating while intoxicated. Our review on this issue is de novo. *In re J.D.S.*, 436 N.W.2d 342, 344 (Iowa 1989). Though we are not bound by the juvenile court's findings, we give weight to those findings and to the credibility the court gives witnesses. Iowa R.App.P. 14(f)(7).

Iowa Code section 232.47(10) requires the State to prove beyond a reasonable doubt that the juvenile engaged in a delinquent act. Iowa Code section 232.2(12)(a) pertinently defines a delinquent act as "[t]he violation of any state law ... which would constitute a public offense if committed by an adult...."

■ The delinquent act alleged here is operating while intoxicated. A person commits this offense when the person operates a motor vehicle and at the time is under the influence of alcohol. Iowa Code § 321J.2(1)(a). A person is "under the influence" when one or more of the following is true: (1) the person's reason or mental ability has been affected; (2) the person's judgment is impaired; (3) the person's emotions are visibly excited; and (4) the person has, to any extent, lost control of bodily actions or motions. *State v. Berch*, 222 N.W.2d 741, 747 (Iowa 1974); II Iowa Uniform Criminal Jury Instructions 2500.2 (1988).

■ On our de novo review we think the evidence is sufficient to establish beyond a reasonable doubt that S.C.S. operated a motor vehicle while he was under the influence of alcohol.

In the adjudication hearing, S.C.S. admitted he had been driving and that before he was stopped he had consumed six 8–ounce glasses of beer. Furness observed all the classic signs of intoxication. He saw S.C.S.'s pickup cross the center line four or five times before the pickup pulled off the highway. S.C.S. swayed from side to side and had to lean up against the pickup to balance himself. Furness smelled liquor on S.C.S.'s breath and noticed that his eyes were red and watery. S.C.S. slurred his words when he talked and failed three out of the five field sobriety tests.

### IV. *Disposition.*

The results of the field sobriety tests were not obtained in violation of S.C.S.'s statutory right to counsel because he was not in custody when such tests were performed. So the juvenile court correctly overruled S.C.S.'s motion to suppress such results. And the evidence establishes beyond a reasonable doubt that S.C.S. was operating a motor vehicle while intoxicated. We vacate the decision of the court of appeals and affirm the judgment of the district court.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.