# IN THE COURT OF APPEALS OF IOWA

No. 23-0446
Filed February 19, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ZACHARY EARL BRAIN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Keokuk County, Crystal S. Cronk,

Judge.


        On discretionary review, the appellant challenges the denial of his motion

to suppress.  **AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS.**


        R.A. Bartolomei of Bartolomei & Lange, P.L.C., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney

General, for appellee.


        Heard by Greer, P.J., and Langholz and Sandy, JJ.

**GREER, Presiding Judge.**

After being nearly involved in a head-on collision, which resulted in injuries to the driver of the other vehicle, Zachary Brain was investigated for driving while under the influence of drugs or alcohol. As part of that investigation, officers spoke with Brain on the scene, conducted standardized field tests and preliminary breath tests, and then obtained a warrant for a bodily specimen from Brain. Pursuant to the warrant, Brain completed a breath test, which showed a BAC of .175. After being charged by trial information,[1] Brain moved to suppress the evidence obtained through his interactions with officers and the result of the breath test. The district court denied Brain's motion to suppress, and he sought discretionary review, which our supreme court granted before transferring the case to us.

Here, Brain seeks suppression of the evidence via multiple theories. First, he argues he was in police custody during the roadside investigation and subject to interrogation without a *Miranda* warning, so his statements to officers (and everything that followed from them) should be suppressed. Second, he argues it is improper for officers to obtain an Iowa Code chapter 808 (2021) warrant for bodily specimens and that obtaining a warrant instead of relying on implied consent violates the constitutional guarantees of equal protection and due process. Third, he urges the warrant in his case was not supported by probable cause, that the officers who obtained it included material falsehoods in the application, and that the warrant violated the particularity clause of the Fourth Amendment because it

---

[1] Brain was charged with three counts of serious injury by vehicle, a class "D" felony, under three separate theories of the crime, and one count of burglary in the second degree.

allowed the troopers to decide on the type of bodily specimen. Finally, Brain argues his statutory right to see a family member and consult an attorney was violated. *See* Iowa Code § 804.20.

**I. Background Facts and Proceedings.**

At approximately 6:40 p.m. on December 21, 2021, Trooper Jacob Vanderpol responded to a call for a possible "serious injury" accident. After arriving at the scene and speaking to other emergency personnel, Vanderpol located Brain and asked him to come back to his patrol car to sit. Almost immediately, Brain described the accident as his fault.[2] When asked if he had been drinking, Brain said yes, that he had consumed a drink that was a mix of vodka and Red Bull, and that he made it in a twenty-ounce cup, adding one small can of Red Bull and filling the rest of the cup with vodka. Brain reported he had the drink about two and a half hours before but, when asked what time he thought it currently was, he stated it was 9:06. According to Vanderpol, the time was actually 7:07 p.m. Vanderpol asked Brain to report his own level of intoxication on a scale from zero to ten; Brain responded, "Two." Having noted Brain's bloodshot, watery eyes, Vanderpol asked Brain to complete field sobriety tests. Brain initially resisted, mentioning his adrenaline and that he felt uncomfortable at the scene.[3] After further discussion,

---

[2] Brain explained that he was in the left lane passing a semitruck on the two-lane highway when he saw another vehicle driving straight toward him. He was in the middle of the length of the semitruck; he could not re-enter his own driving lane. Attempting to not hit each other head on, both Brain and the other driver left the roadway. While Brain was able to get himself out of his vehicle and was up and speaking, the other driver was ultimately extracted from his vehicle and eventually taken by helicopter to the hospital.

[3] At this point, the other driver was still being rescued from his vehicle; the medical helicopter was not yet on scene but several emergency vehicles were present.

he submitted to the horizontal gaze nystagmus test before asking to return to the patrol car to warm up. Vanderpol later testified that Brain showed six out of six clues of intoxication.

While Brain sat in the patrol car, Vanderpol spoke to another trooper, who reported he was able to smell alcohol coming from Brain's person and that a previously-opened bottle of whiskey was found in Brain's truck.[4] Vanderpol returned to Brain and presented the option of leaving the scene and going to the local law center to complete field sobriety tests. Brain interjected, "That's fine." At about the same time, the medical helicopter arrived on the scene for the other driver. At that point, Brain seemed to ask Vanderpol to take him to the law center, saying "Take me up there buddy," and "I gotta get out of here [be]cause this is driving me fucking nuts, I feel like I killed a guy."[5]

During the several minute drive to the law center, Vanderpol and Brain casually chatted about things unrelated to the incident.

After they went inside the law center, Brain completed both the walk-and-turn test and one-leg-stand test. At the suppression hearing, Vanderpol testified Brain exhibited three of eight clues of intoxication on the first and three of four clues on the second. Then Vanderpol asked Brain to complete a preliminary breath test. After getting the result, Brain expressed disbelief at the level of his BAC, and Vanderpol asked him if he wanted to try again. Brain said, "Yes, please," and Vanderpol administered a second preliminary breath test.

---

[4] Trooper Vanderpol testified he had lost his sense of smell after having COVID-19; he relied on the other trooper for this observation.

[5] These statements are taken from the audio of Trooper Vanderpol's dashcam footage; we do not have a transcript of the audio.

Vanderpol then prepared a warrant application, asking for authorization to obtain "[a] blood, urine, and/or breath specimen" from Brain. Vanderpol included observations from the scene of the accident in the application, including that a sergeant and a trooper smelled alcohol coming from Brain, that Vanderpol observed signs of impairment, and that Brain admitted to drinking. Vanderpol included the following "observations of impairment" in his application:

TIME OBSERVATIONS BEGAN: 6:50 p.m.

- ☒ Bloodshot eyes
- ☒ Watery eyes
- ☐ Slurred speech
- ☐ Mumbled speech
- ☒ Smell of alcoholic beverage coming from Suspect's person
- ☒ Unsteady gait / unsteady balance
- ☒ Open containers of alcohol observed at the scene
- ☐ Drug paraphernalia observed at the scene
- ☒ Emotions visibly excited
- ☐ Judgment impaired
- ☐ Reason or mental ability affected
- ☐ Soiled clothing
- ☒ Other observations of impairment:
  Admission to drinking alcohol

☐ Suspect is currently unconscious or otherwise unable to consent.

STANDARDIZED FIELD SOBRIETY TESTING (Please indicated score, refusal, or inability)

| Test | Score/Refusal/Inability |
|---|---|
| Horizontal Gaze Nystagmus | 6 clues and vertical Nystagmus |
| Walk and Turn | 3 clues |
| One leg stand | 3 clues |
| Preliminary Breath test results | .212% BAC |
| Admission to drinking | Yes-vodka mixed drink |
| Other | |

Vanderpol drove the paper warrant application to a magistrate while Trooper Tracy Vanderwiel stayed with Brain at the law center. After the magistrate issued the warrant, Vanderpol contacted Vanderwiel and told him he had a signed

warrant in hand and to get Brain's breath specimen. At first, Brain indicated that he would not comply with giving a breath sample. After Vanderwiel spoke to Vanderpol again, Vanderwiel told Brain that refusing to comply with the warrant could lead to a finding of contempt and jail time. Then, Brain submitted to a DataMaster test of his breath specimen; his BAC was .175 at 9:16 p.m. When Vanderpol returned to the law center, he placed Brain under arrest.

Brain moved to suppress evidence on several theories. Following a hearing, the district court rejected each of Brain's claims and denied his motion to suppress. Specifically, the court ruled: (1) Trooper Vanderpol's decision to obtain a warrant for Brain's breath specimen—rather than invoking implied consent under chapter 321J—did not violate Brain's equal protection rights; (2) Brain's section 804.20 rights were not violated because Brain retained his cell phone while at the law center, was told he could use it as he wished, and Brain did use his phone; (3) Vanderpol had probable cause to administer the preliminary breath tests, to which Brain consented; (4) the fact that the warrant allowed the troopers to decide on the type of bodily specimen to obtain and test ("[a] blood, urine, and/or breath specimen") did not make it so broad that it was an impermissible general warrant; (5) Brain failed to establish his claim that his due process rights were violated by Trooper Vanderpol's failure to inform him of the possible uses of his preliminary breath test results and his right to refuse the test; and (6) because the investigatory stop of Brain did not evolve into police custody, he was not entitled to *Miranda* warnings earlier in the encounter.[6] Brain appeals.

---

[6] Brain filed a motion to enlarge and reconsider, which the district court denied.

**II. Standard of Review.**

When reviewing the district court's interpretation and application of chapter 321J, our review is for the correction of errors at law. *State v. Flynn*, 13 N.W.3d 843, 846 (Iowa 2024).

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Brown*, 930 N.W.2d 840, 844 (Iowa 2019) (citation omitted).

**III. Discussion.**

**A. Were *Miranda* Warnings Required?**

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Recognizing the need for "adequate safeguards to protect precious Fifth Amendment rights," the Supreme Court requires police officers to advise suspects of their Fifth Amendments rights before custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 457 (1966). Police must tell the individual

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 444. Statements made during custodial interrogation by an individual who was not given *Miranda* warnings are inadmissible. *See State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009); *New York v. Quarles*, 467 U.S. 649, 654 (1984).

*Miranda* warnings are only required when an individual is "both in custody and subject to interrogation."[7] *State v. Park*, 985 N.W.2d 154, 168 (Iowa 2023). Here, the district court concluded the investigatory stop did not evolve into custody until Brain was formally placed under arrest, so there was no violation of Brain's Fifth Amendment rights and suppression was not required. Brain argues he was in custody at the scene when Vanderpol arrived and began investigating him for a crime. He asks us to suppress his statements not only in a future criminal trial but also for the purpose of Trooper Vanderpol's warrant application.

"Custody means there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (cleaned up). We use an objective test when deciding whether the individual was in custody; the question is "if a reasonable person in the defendant's position were to believe they were in custody." *Id.* "The test is based on 'objective circumstances, not the subjective belief of the officers or the defendant.'" *Id.* (citation omitted). And we use four factors to guide our decision: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning." *Id.* (quoting *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997)).

---

[7] It is undisputed that Brain was subjected to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnotes omitted)). So, the question of whether *Miranda* warnings were required for Brain's statements to be admissible hinges on whether Brain was in custody at the time he made them.

Brain argues he was in police custody immediately upon Trooper Vanderpol's arrival on scene because Trooper Vanderpol was investigating him for a crime, he was not free to leave the area, and he could not unilaterally end the encounter. But the fact that an individual is being investigated for a potential crime while having less than absolute freedom of movement does not automatically translate to "custody." *See Terry v. Ohio*, 392 U.S. 1, 22 (1968); *State v. Tyler*, 830 N.W.2d 288, 293 (Iowa 2013) ("Our decisions have universally held that the purpose of a *Terry* stop is to investigate crime."). Courts have repeatedly held that a person is not in custody for purposes of *Miranda* when they are briefly detained in a traffic or *Terry* stop—a time when they are generally being investigated for a possible crime and are not free to flee. *See, e.g.*, *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." (internal citation omitted)); *State v. Scott*, 518 N.W.2d 347, 350 (Iowa 1994) ("The temporary detention of a motorist in an ordinary traffic stop is not considered 'in custody' for purposes of *Miranda*."). And asking the suspect questions relevant to the possible crime and to participate in field sobriety tests does not necessarily convert the encounter into "custody." *See In re S.C.S.*, 454 N.W.2d 810, 812–14 (Iowa 1990) (applying *Berkemer v. McCarty*, 468 U.S. 420 (1984)). That said, "the evolution of interrogation from ordinary fact-finding into a highly confrontational and accusatorial proceeding [can] convert[] a voluntary encounter into a custodial interrogation." *State v. Schlitter*, 881 N.W. 2d 380, 407 (Iowa 2016) (Appel, J., dissenting in part), *abrogated on other grounds by State v. Crawford*, 972 N.W.2d

189, 202 (Iowa 2022). So, we consider the *Countryman* factors to determine whether Brain was in custody before he was formally placed under arrest.

First, we assess the language Vanderpol used to summon Brain. We note Vanderpol did not initiate a stop of Brain; he arrived on scene based on a report of an accident, and Brain was already out of his truck on the side of the road. When Vanderpol approached Brain, he asked Brain to sit in his patrol car—he did not demand it. *See State v. Tyler*, 867 N.W.2d 136, 172 (Iowa 2015) (noting officers did not demand the defendant speak with them). During their exchange, both Vanderpol and Brain were polite and amiable toward each other. Vanderpol expressed understanding of Brain's feelings following the incident and sought information about the condition of the other driver at Brain's request; the two chatted about other members of law enforcement they both knew, and Brain told Vanderpol about his daughter and a recent trip they took for his job. Vanderpol did not make a show of authority. When he first asked Brain about completing field sobriety tests, Brain responded he did not want to but suggested it was because of the chaotic nature of the scene and feeling uncomfortable with so many people around to witness. Vanderpol gave Brain the option to go to the law center, and Brain expressed that he wanted to do so. Vanderpol drove Brain to a second location—a building that housed the local jail. But Brain rode in the front of the patrol car with Vanderpol; he was not handcuffed, and he had control of his cell phone. *See id.* (noting the defendant "was neither handcuffed nor forcibly placed in the back of [the officer's] vehicle"). The two walked into the law center through a door open to the public and went to an unlocked room. Vanderpol retained his

general freedom of movement—he remained un-handcuffed, he got up and got water multiple times, and he continued to hold and use his cell phone.

Moving a suspect from the public roadside to a second location that is less observable by the public sometimes indicates a custodial interaction. *Cf. S.C.S.*, 454 N.W.2d at 813 ("[I]n a typical traffic stop a motorist does not feel completely at the mercy of the police. . . . [T]he interaction between the motorist and the officer is usually seen by pedestrians or other motorists. This public exposure reduces the ability of an unscrupulous officer to use illegitimate means to elicit self-incriminating statements."). But in this specific case, Brain expressed he was cold and that he was uncomfortable remaining at the scene. Vanderpol presented going to the local law center as an option, and Brain affirmatively stated he wanted to do so. The record shows that Brain voluntarily accompanied Vanderpol to the law center. *See State v. Smith*, 546 N.W.2d 916, 923 (Iowa 1996) ("Although coming to the [place of questioning] voluntarily is not alone enough to negate a finding of custody, it is indicative of the state of mind of a reasonable person in the situation."); *State v. Brown*, 341 N.W.2d 10, 16 (Iowa 1983) (finding no custodial interrogation where the defendant "accompanied officers to the police station voluntarily and was at no time subjected to either physical or verbal restraint"). Although Vanderpol's motivation to move Brain to the law center may have been to further his own investigation of the crime rather than Brain's comfort, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Berkemer*, 468 U.S. at 442. This factor weighs against custody.

Second, we consider the purpose, place, and manner of the interrogation. At the suppression hearing, Vanderpol estimated that he responded to the call about the accident at approximately 6:40 p.m., and Brain completed the DataMaster test of his breath specimen at 9:16 p.m. and was formally placed under arrest soon after—a period of less than three hours. *See Countryman,* 572 N.W.2d at 558 ("The three-hour length of the conversation did not render it custodial."); *Brown*, 341 N.W.2d at 16 (finding no custody despite two and one-half hours of questioning). While some of the interrogation took place at the law center, this alone does not convert the encounter to "custody." *Tyler*, 867 N.W.2d at 172. We consider "factors including the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks, and the type of questioning in which those conducting the interview engage." *Id.* at 172–73. The questioning was all conducted by one person, Trooper Vanderpol. Vanderpol's tone remained friendly and calm. The two were engaged in conversation. And as already stated, Brain was allowed to move around, including getting water as he wished, and he remained in possession of his cell phone, which he appeared to use at will. This factor also weighs against finding Brain was in custody.

Third, we consider the extent to which Brain was confronted with evidence of his guilt. Vanderpol did not confront Brain—Brain freely made statements that the accident was his fault, that he knew better, that he drank a mixed drink of vodka and Red Bull, and that he was at a "two" on an intoxication scale of zero to ten. And, when Brain expressed disbelief at the result of his first preliminary breath test,

Vanderpol offered him a second test rather than confronting Brain about the reliability of the result. This also weighs against a finding of custody.

Finally, we consider whether Brain was free to leave the scene or the law center during Vanderpol's ongoing investigation. Brain was not free to unilaterally end the encounter; he did not have a vehicle to leave the area and he would not have been allowed to leave with someone else. But he was not handcuffed or kept in a locked room; he retained freedom of movement within the trooper's presence. And Brain did not attempt to leave, so Vanderpol made no show of force; he did not command Brain to stay or physically prevent him from exiting. While Brain would not have been allowed to leave, "the degree of physical restraint imposed during the interrogation" was small. *See Countryman*, 572 N.W.2d at 558. This is not enough to convert the encounter into police custody for *Miranda* purposes.

Because Brain was not "in custody" before his formal arrest, there is no basis to suppress his statements under *Miranda*.

**B. The Search Warrant.**

Next, Brain raises several challenges to the search warrant application and the warrant that issued. He makes a combination of facial and as-applied challenges.

**1. Was the Warrant Supported by Probable Cause?**

Brain argues "the district court made no determination of the sufficiency of the warrant application, much less the falsity or misleading nature of the information supplied the issuing judge to be stricken."

A defendant can challenge a warrant either (1) by claiming the facts recited in the affidavit attached to the warrant application do not establish probable cause

that the search will reveal evidence of a crime or (2) by challenging the veracity of the warrant application itself when the defendant has reason to believe it contains false or misleading statements. *State v. Harbach*, 3 N.W.3d 209, 217 (Iowa 2024). When the defendant wishes to contest the validity of the warrant by challenging the veracity of the warrant application, the defendant "must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Id.* at 218 (quoting *Franks v. Delaware*, 438 U.S. 154,155–56 (1978)). Then, "[i]f that preliminary showing is made, the court holds a hearing—referred to as a '*Franks* hearing'—where evidence may be presented to show whether the statements are knowingly or recklessly false." *Id.* "A defendant may also challenge the warrant application as intentionally omitting material facts that, if included, would cast doubt on the existence of probable cause." *Id.* If, after the *Franks* hearing, the court concludes "that any misstatements or material omissions were made intentionally or with reckless disregard for the truth, [then] the false statements are excised, the omitted statements are added, and the affidavit's remaining content is examined to determine whether it establishes probable cause to support issuing the search warrant." *Id.*

Here, Brain complains the district court did not rule which, if any, statements in the warrant application were knowingly or recklessly false. And, because it did not determine which statements were improperly included in the warrant application, it did not take the next step of considering whether the application was sufficient even with those statements excised. But Brain never raised this issue to the district court. Through his questioning at the suppression hearing, Brain

suggested that some facts included in the warrant application could have non-incriminating explanations (like that Brain may have hit his head during the accident), but those insinuations were not enough to raise a *Franks* issue to the district court's attention.[8] Plus, even if he thought the issue was properly raised but overlooked by the district court, Brain had the burden to ask the district court for a ruling in his motion to reconsider and enlarge. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."). We do not consider this issue further.

Next, Brain argues that he did not voluntarily submit to either the field sobriety tests or the preliminary breath tests. He maintains that the results of those tests should not have been included in the search warrant application because, while participation is optional, he was repeatedly told to complete them rather than being allowed to refuse. *Cf.* Iowa Code § 321J.5(1) (providing when an officer "may *request* that the operator provide a sample of the operator's breath for a preliminary screening test" (emphasis added)). Even if we were persuaded that Brain was improperly pressured to complete the voluntary tests and that those test results should be excised from the warrant application, we would still find the warrant was properly supported by probable cause.

---

[8] As our supreme court stated in *Harbach*, "[t]hat other explanations might exist for an officer's observations is insufficient to establish the statement's falsity." 3 N.W.3d at 221.

Brain was nearly part of a head-on collision when he was driving in the left lane of a two-lane highway. When troopers found Brain at the scene, he had bloodshot, watery eyes and smelled of an alcoholic beverage. An open alcohol container was found in Brain's vehicle, and Brain admitted drinking a mixed drink with vodka in it. Based on these facts from the warrant application, a reasonable person would believe that Brain was likely driving while impaired and that evidence of Brain's intoxication could be confirmed by testing a body specimen. *See State v. Baker*, 925 N.W.2d 602, 613 (Iowa 2019) ("The test for probable cause is 'whether a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there.'" (citation omitted)); *see also State v. Wenzel*, 987 N.W.2d 473, 485 (Iowa Ct. App. 2022) (concluding issuing judge had probable cause to issue warrant for bodily specimen). There was a substantial basis to grant the warrant—even without the field sobriety tests and the preliminary breath tests. *See id.*

**2. Can a Chapter 808 Warrant be Used to Obtain a Bodily Specimen?**

Brain argues it was improper for Vanderpol to obtain a chapter 808 warrant for a bodily specimen rather than invoking the implied consent procedures in section 321J. Our supreme court recently considered this issue in *State v. Laub*, 2 N.W.3d 821 (Iowa 2024). Like this court before it, the supreme court held that the implied consent statute in chapter 321J "is not the exclusive means by which law enforcement may obtain chemical testing." *Laub*, 2 N.W.3d at 826 (quoting *State v. Frescoln*, 911 N.W.2d 450, 454 (Iowa Ct. App. 2017)). Warrants obtained pursuant to chapter 808 can be used to collect and test bodily specimens for the criminal investigation of driving-while-impaired cases. *Id.* at 833–34 (collecting

cases). We are bound by this precedent, so we do not consider this issue further.[9] *See State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent.").

### 3. Was the Warrant Impermissibly Broad?

Brain argues the warrant violated the particularity clause of the Fourth Amendment because it allowed the troopers to decide on what bodily specimen to obtain: "[a] blood, urine, and/or breath specimen." Of those approved specimens, the trooper proceeded with obtaining only the least intrusive means—as the State commented at oral argument, Brain is essentially complaining that law enforcement should have "taken more from him." "Both the Iowa and United States Constitutions, as well as the Iowa Code, require that the warrant and affidavits particularly describe what is to be searched and what is to be seized." *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996) (citing U.S. Const. amend. IV, Iowa Const. art. I, § 8). "The particularity requirement ensures that nothing is 'left to the discretion of the official executing the warrant.'" *Id.* at 669 (citation omitted). But we are not "hypertechnical" in our application of this requirement. *Id.*; *see also Hemm v. State*, No. 09-0616, 2010 WL 786049, at *4 (Iowa Ct. App. Mar. 10, 2010) (reviewing "the specificity of [a] search warrant under a 'practical accuracy' standard" (citation omitted)).

---

[9] Brain also argues "the district court never considered or ruled upon the misrepresentations made to obtain a breath specimen under threat of arrest for refusal not provided under [a chapter 808] warrant rendering submission involuntary." As this issue was never ruled on by the district court, we do not address it. *See Meier*, 641 N.W.2d at 537 ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

The district court rejected Brain's argument, concluding:

> The present warrant authorized law enforcement to collect a blood, urine, or breath sample from [Brain] in order to determine his blood alcohol content. It is undeniable that the warrant clearly identifies the subject of the search and seizure i.e., the blood, urine, or breath of [Brain], and does not venture in the realm of a general warrant. [Brain's] argument that the warrant impermissibly allowed law enforcement to exercise discretion to determine which of three samples to take is a hypertechnical interpretation of the warrant. The option of the three methods is a practical consideration in situations of suspected intoxicated driving when the suspect may be unable or unwilling to provide one type of sample, but a sample obtained from one of the other methods is available. For example, if a suspect was unwilling provide a breath sample, even when presented with the warrant, law enforcement could get a blood sample instead. It would be impractical, and offer no additional constitutional protections, to require law enforcement to obtain a warrant for the breath in hopes that the suspect would be compliant and then obtain a second warrant for the blood.

We agree with the district court; Brain's argument fails.

### 4. Did the Warrant Process Violate Brain's Constitutional Rights?

Brain asserts that by using a warrant, rather than invoking implied consent under chapter 321J, police violated his rights to equal protection, due process, or both. He urges that in this constitutional realm there are still unanswered questions following our supreme court's decision in *Laub*.

**Equal Protection.** At their core, the equal protection guarantees of the federal and state constitutions "are meant to protect 'against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Laub*, 2 N.W.3d at 834 (citation omitted).

Chapters 321J and 808 make "no distinctions between persons, let alone distinctions between similarly situated persons." *Id.* So the threshold test is not

satisfied as to the first step of the equal protection test. *See id.* Insofar as Brain challenges Vanderpol's exercise of discretion in choosing one path over the other, "[t]here are some forms of state action which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 835 (cleaned up). "A statutory scheme that allows a peace officer to exercise investigative discretion, and a peace officer's exercise of that discretion, in and of itself, does not violate the federal or state constitutional guarantees of equal protection under the law." *Id.*

Brain's equal protection challenge fails.

**Due Process.** Brain urges that both his procedural and substantive due process rights were violated by obtaining a warrant rather than invoking implied consent. He argues his procedural due process rights were violated because he was prevented from refusing to provide the bodily specimen, which he would have been allowed to do under Iowa Code section 321J.10.

But as our supreme court recently held in *Laub*, because "statutory implied consent procedures are not mandated by the due process provisions of the United States Constitution," the decision to forego those procedures is not a violation of a defendant's right to procedural due process. 2 N.W.3d at 837 (cleaned up); *see also State v. Baraki*, 981 N.W.2d 693, 697 (Iowa 2022) (recognizing that while the statutory implied consent procedures give a potentially intoxicated driver a choice whether to comply with a breath test, "[t]he choice is not *constitutionally* required").

Brain also has not established a substantive due process violation. Brain does not have a constitutional right "to refuse consent to provide a bodily specimen for chemical testing on penalty of having [his] license revoked or having [his]

refusal be admitted in a criminal trial." *Laub*, 2 N.W.3d at 837. And insofar as he challenges Vanderpol's conduct—choosing to obtain a search warrant rather than invoke implied consent—this claim also fails:

> A peace officer obtaining a search warrant in compliance with federal and state constitutional requirements to investigate suspected criminal activity in no way shocks the conscience or offends human dignity. To the contrary, the Supreme Court has explained that use of a search warrant to investigate OWI offenses is the constitutionally preferred method of investigation.

*Id.* at 837.

Brain's constitutional challenges fail.

**C. Section 804.20**

Iowa Code section 804.20 provides:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

Brain urges that his statutory right was violated because he was not advised he could call an attorney and was not allowed to see his mother at the law center when she arrived. He seeks suppression of the DataMaster test result based on these alleged violations.

"[S]ection 804.20 does not itself require that a peace officer advise the detainee of the detainee's rights under the statute." *State v. Casper*, 951 N.W.2d

435, 438 (Iowa 2020). But when the right is invoked, an officer cannot deny the right exists or sit by silently. *See State v. Hicks*, 791 N.W.2d 89, 94, 96 (Iowa 2010). The peace officer must then "provide the suspect with a reasonable opportunity to contact an attorney or family member." *Id.* at 94. Here, it is not clear Brain ever asked to speak to an attorney. On appeal, he argues he should have been advised he could do so without making the request. But as we already stated, an officer does not have a duty to advise until the defendant invokes the right. *See id.* at 94. And Brain was allowed to keep his cell phone in his possession and use it without restriction—if he wanted to call an attorney he could have done so. In fact, Brain made at least four phone calls, and a video from the law center admitted at the suppression hearing appears show him using the device in other ways as well. *See State v. Simmer*, No. 02-1125, 2003 WL 21230199, at *2 (Iowa Ct. App. May 29, 2003) (concluding defendant was given reasonable opportunity to contact family member or attorney when the defendant was permitted to keep her cell phone in their possession and had unrestricted use to it).

Additionally, while Brain contends he was prevented from seeing his mother when she arrived at the law center, no evidence was introduced to establish that his mother was ever actually present. Based on the video from the law center, Brain called his mother and asked her to bring him tobacco products. Later, after Brain had taken the DataMaster test and Vanderpol returned to the law center with the signed warrant, Brain reported that his mother was on the way. There was neither testimony nor video evidence that his mother actually came to the law center before Brain completed the breath test or was placed under arrest. We

cannot find a violation of Brain's statutory rights when there is no evidence to support his allegation.

And even if Brain's section 804.20 rights were violated, suppression of the tests results is not the appropriate remedy because the "results can be traced to a source independent of any violation of section 804.20"—"a lawfully issued search warrant." *State v. McMickle*, 3 N.W.3d 518, 522 (Iowa 2024). That is not to say that law enforcement can or should disregard a defendant's section 804.20 rights—the statute imposes criminal liability on a person who does so. *See* Iowa Code § 804.20 ("A violation of this section shall constitute a simple misdemeanor."); *see also McMickle*, 3 N.W.3d at 523 (McDermott, J., concurring) ("The statutory remedy imposing criminal liability exists notwithstanding a court's refusal to suppress evidence when an officer violates [section] 804.20. Simply because an officer validly obtains evidence against a suspect through other means does not grant the officer immunity from criminal prosecution for infringing this right."). But Brain's remedy—assuming he could show a violation—is not the suppression of the DataMaster results.

**IV. Conclusion.**

We affirm the district court's denial of Brain's motion to suppress and remand for further proceedings.

**AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS.**